JOHN S. MINOR v. CHARLES BEWICK, ANDREW W. COM-
STOCK, WILLIAM B. COMSTOCK AND THE COMMIS-
SIONER OF THE STATE LAND-OFFICE.

*Title by special indorsement—Delivery without indorsement—Alteration of indorsement—Compromise—Rescission.*

1. The act of an indorsee of negotiable paper in changing a special indorsement to himself so that it shall be in blank cannot alter the title by which he holds the paper.

2. Delivery of negotiable paper without indorsement does not amount to a transfer of the title thereto unless by way of equitable assignment, and as such an assignment is not, like a negotiable transfer, discharged of equities, any person in possession thereby cannot confer by delivery any better title than he owns, and is not authorized to sue on the paper in his own name.

3. The State can cancel its own indorsement before delivery.

4. The recognition by one party to a compromise of the other's right to rescind it cannot be affected by any subsequent dealings of the latter.

Appeal from Alpena. (Emerick, J.) Nov. 19.—Jan. 7.

BILL of interpleader. Defendant Commissioner of State Land-office appeals. Reversed.

*Seth D. Carpenter* for complainant.

*J. C. Shields* and *John Atkinson* for defendants.

CAMPBELL, J.  Complainant filed a bill in the nature of an interpleader to determine whether certain notes made by him should be paid to the State Land-office, or to the defendants Bewick and Comstocks. The controversy is therefore between the defendants, and arose in this wise.

In the beginning of 1878, Minor, the complainant, bought a considerable amount of logs from one James McElroy. It was claimed by Gen. Partridge, who was then Land Commissioner, that a large part of these logs had been cut on State lands. A

settlement was made between the Commissioner and McElroy, whereby $2100 was to be paid in short paper, and a further sum of money in addition, amounting to $122. By arrangement Minor gave his personal notes, being two of $1050 each, payable to the order of B. F. Partridge, Commissioner, in four months at the American National Bank, Detroit, and these were accepted in settlement. These notes were to mature on the 18th of September, 1878. A few days before their maturity McElroy filed a bill to restrain the Land Commissioner from collecting them, setting up as a reason that the amount of timber which he really cut from the State lands had been overestimated, and that he had been thereby led to pay more than twice what he should have done, estimating the logs at two dollars a thousand, which he claimed to have been the price agreed on upon the settlement. During the pendency of this suit the notes remained in the hands of the State, and were not presented for payment.

In August, 1881, McElroy's bill was dismissed, and he appealed to this Court, but the appeal has not thus far been pressed for hearing. Minor then, being about to leave the State for a journey, and to be away for some time, made arrangements with his bankers to have the notes paid on presentation, and deposited money for that purpose.

Mr. Van Riper, who entered on the duties of Attorney General in January, 1881, ascertained a few months thereafter the condition of the litigation, and that James D. Turnbull was counsel for McElroy, and expressed to him a desire to get the matter closed up as soon as it could be. Turnbull had an interview with him in the fall, and proposed to leave it to him, after he should examine into the facts, to determine what would be fair and just. This Mr. Van Riper would not undertake, but desired an interview at some convenient time to talk it over. They had a casual meeting at Lansing in January, 1882, and it was understood they would meet, and they did meet in February. At this meeting a conference was had with Mr. Neasmith the Commissioner, and the result was an agreement that the notes should be given up

to Mr. Turnbull on payment of $1100; and this agreement was carried out, and the money paid over.

The controversy turns on this agreement chiefly, and the purposes for which it was made, and the understanding which led to it. Turnbull claims that he appeared in the matter for the purpose of compromising and settling the McElroy suit, and that the notes belonged to himself by assignment from McElroy, and he was entitled to collect them from Minor for his own benefit. There seems to be no doubt that he was entitled to any interest owned by McElroy.

The State authorities testify unequivocally that in this arrangement of February 1882, Mr. Turnbull was acting ostensibly on behalf of Minor and of no one else, and that they were only induced to compromise by his representation that the trespass was overrated, and that Minor ought not to pay as much as $1100, but would pay that but no more, as he was anxious to close it up; that their action was based on Minor's departure, and the likelihood that he would pay no more, and that no one else was supposed to be interested in the agreement of settlement. And they are positive that no conditions were made in any other interest.

Prior to this time these officers had heard reports that Minor had deposited money to pay these notes, but they testify that Turnbull's assertions led them to infer that this was not so, and that he would not pay beyond the amount of $1100.

On the 9th of May, Mr. Van Riper having discovered that Minor had made provision for paying the whole amount of the notes, and that Turnbull had claimed that he owned them on his own account, called on Mr. Turnbull to have the settle-ment canceled and the notes returned, and an agreement was made that it should be rescinded and the notes returned. Turnbull admits this last agreement, but claims that it was with the understanding that the Attorney General was to execute a paper to the effect that the settlement was the result of honest mistake and misunderstanding, and that no wrong had been done by Turnbull. Very shortly thereafter, before any steps had been taken to complete this new arrangement,

Mr. Turnbull refused to go further, on the alleged ground that he had been attacked in the public newspapers for fraud imputed to him in his dealings with the State in procuring the settlement, and that the attacks were instigated or inspired by the Attorney General. The proofs do not bring these attacks home to the Attorney General, but Mr. Turnbull claims to have acted on that belief, and to have been so informed.

Meanwhile Mr. Minor had made arrangements with Mr. Maltz, a banker in Alpena, to pay the notes on presentation, but denied his liability for interest because the notes drew none on their face and payment had never been demanded, and he had always been ready to pay them. Turnbull had knowledge of the fact that Maltz had been authorized to pay them, before he made the compromise, but did not convey this information to the State officers. After he got the notes they were presented for payment to Maltz, with demand of interest, but he refused to pay more than their face.

Sometime in April it is claimed that Turnbull sold the notes to Bewick, Comstock & Co., the defendants, for $2000, and they claim to have become bona fide purchasers. The notes were already in their possession as Turnbull's banking agents, and this $2000 was put to his credit on deposit account, among his other deposits, on which he was from time to time drawing checks. Before they had collected them the State authorities had given Minor notice not to pay. They sued Minor, and this bill was the result, as he desired to be protected in paying to the true owner.

A preliminary question of some importance is made on behalf of Bewick, Comstock & Co., who claim that as they had no knowledge of any circumstance vitiating the transaction whereby Turnbull got these notes from the State, they must in any event be protected as bona fide holders of negotiable paper. But in our opinion, they do not occupy this position. This paper was payable to the order of Gen. Partridge, Land Commissioner, and by him endorsed without recourse to Michigan State Treasurer or order, and by the Treasurer to the American National Bank or order. This last endorsement seems to have been made for the account of the

State and the State could cancel it. But when these notes were handed to Turnbull they were not endorsed to him, and the only way in which Bewick, Comstock & Co. made apparent title was by changing Partridge's special and qualified endorsement into a blank endorsement. We do not see how title could be made in that way. Partridge had made a special endorsement, and the legal title had thereby become vested in the State Treasurer, who might no doubt recall any endorsement made by himself, but who could not change the form of his own title, and who does not appear to have attempted to do so. Whether the notes were, as claimed by the Land Commissioner, delivered up to the maker, or whether as claimed by Turnbull, they were delivered over in some other way, there was no transfer by endorsement, and the title of the State appeared still to exist, and if transferred at all was only by delivery as an equitable assignment. Our statutes do not provide that mere assignees of negotiable paper can sue in their own names where not holders by negotiable transfer. If Turnbull had title at all it was merely as such assignee, and such an assignment could not stand, like a negotiable transfer, discharged of equities. The State appeared to be the owner, or if not the State the American National Bank, and Turnbull could not confer by delivery any better title than he owned. But beyond this these notes were long overdue, and had ceased to be negotiable at all, so far as would discharge prior equities. While there is no reason to suppose Bewick, Comstock & Co. had any improper design, they are not in a position to claim as bona fide holders, by endorsement, and it may be questioned whether they had not actual notice enough to affect them. But this does not become important.

Upon the merits we have no doubt that the State officers supposed they were dealing with Minor, and never designed to sell or transfer the notes to a new holder. The minds of the parties never met on a sale, and there is no reason to believe that Mr. Van Riper or the Commissioner would have been willing to make any arrangement except with their debtor. Minor was the only person on whom the State had any claim.

The subsequent dealings with Turnbull, when the Attorney General had no notice of any transfer of the notes to Bewick, Comstock & Co., and when he knew there had been no such endorsement as could transfer a legal title were a distinct recognition and understanding that the compromise was abandoned, and we think the facts were sufficient to authorize its rescission.  Whether the parties would have executed the formal certification which Mr. Turnbull expected we cannot of course determine, because he undertook to repudiate the revocation before the authorities at Lansing had a chance to complete their share of the restoration of consideration.  The recognition by Mr. Turnbull of the right to rescind, made in an entirely amicable interview, could not lose its force as evidence of the understanding of the parties by any personal offense well or ill founded, taken thereafter, and we are not called on to consider the personal issues concerning the authorship of the articles which have very properly been left out of evidence.  We think there was no such arrangement understandingly made on the part of the State, as was meant to keep these notes alive in the hands of any new holder, and that the State officers did not suppose they were contracting with any one but Minor.  This being so, no other person was brought into contract relations with the State.

It results from this that the State continued to own the notes, and was as between itself and Minor entitled to collect them.  If there are equities to have the money refunded, in favor of McElroy or his assigns, they cannot be disposed of in this suit.

The decree must reversed, so far as it is in favor of Bewick and the Comstocks, and the fund must be paid over to the Land Commissioner, who will recover costs of both courts against Bewick and the Comstocks.

The other Justices concurred.